Argued and submitted September 13, decision of Court of Appeals and order of
Workers' Compensation Board affirmed December 9, 2010

In the Matter of the Compensation of
Barbara L. Hopkins, Claimant.

Barbara L. HOPKINS,
*Petitioner on Review,*

*v.*

SAIF CORPORATION
and Nyssa Gardens Adult Alternative Living,
*Respondents on Review.*

(WC 0407794; CA A138825; SC S058081)

245 P3d 90

R. Adian Martin, Ransom, Gilbertson, Martin, & Ratliff, LLP, Portland, argued the cause for petitioner on review.

David L. Runner, Appellate Counsel, Salem, argued the cause and filed the brief for respondent on review.

Before De Muniz, Chief Justice, and Gillette, Durham, Balmer, Walters, and Kistler, Justices.**

WALTERS, J.

---

** Linder, J., did not participate in the consideration or decision of this case.

## WALTERS, J.

This case requires that we determine the legislature's meaning of the term "arthritis" in ORS 656.005(24)(a)(A). We conclude that, in defining preexisting conditions for workers' compensation claims, the legislature intended the term "arthritis" to mean the inflammation of one or more joints, due to infectious, metabolic, or constitutional[1] causes, and resulting in breakdown, degeneration, or structural change. We also decide that the evidence in the record was sufficient to permit the Workers' Compensation Board (board) to find that, at the time of her work-related injury, petitioner suffered from preexisting "arthritis" as we define it. We therefore affirm the board's denial of petitioner's claim for workers' compensation benefits.

Petitioner was a caretaker at an assisted-living facility. On May 3, 2004, petitioner was preparing medications for the residents when she bent down to retrieve medication from a drawer about eight inches from the ground. Petitioner felt a sharp pain in her hip. When she stood again, her legs felt numb and tingly. Shortly thereafter, petitioner's legs became totally numb, and she was unable to move them. Petitioner was transported by ambulance to the hospital and the next day received an MRI of her thoracic spine, which revealed disc herniations. Dr. Hajjar, a neurosurgeon, performed multiple laminectomies, discectomies, and fusions on petitioner's thoracic spine. Today, petitioner is paraplegic.

Petitioner filed a workers' compensation claim for her thoracic spine condition on May 5, 2004, and respondent denied the claim on August 17, 2004. At the hearing on petitioner's claim,[2] an administrative law judge (ALJ) considered

---

[1] Although the term "constitutional" generally is used in judicial opinions to mean of or pertaining to the Oregon or United States constitutions, we use that term in this opinion to mean of or pertaining to the structure of the body. *See Webster's Third New Int'l Dictionary* 486 (unabridged ed 2002) (defining "constitutional" as "having to do with, inherent in, or affecting the constitution or structure of body or mind").

[2] ORS 656.283 provides that "any party or the Director of the Department of Consumer and Business Services may at any time request a hearing on any matter concerning a claim," and further provides procedures for that hearing.

both whether petitioner had suffered a compensable work-related injury and whether she suffered from "arthritis."

Under ORS 656.266(1), a worker has the burden of proving that he or she has suffered a "compensable injury."[3] To establish a "compensable injury," the worker must prove that a work-related injury is a material contributing cause of a disability or need for treatment. ORS 656.005(7)(a); ORS 656.245(1)(a) ("For every compensable injury, the insurer * * * shall cause to be provided medical services for conditions *caused in material part* by the injury." (Emphasis added.)). *See SAIF v. Sprague*, 346 Or 661, 663-64, 217 P3d 644 (2009) (discussing standards for showing injuries in workers' compensation cases); *Albany General Hospital v. Gasparino*, 113 Or App 411, 415, 833 P2d 1292 (1992) (discussing legislative history and concluding major contributing cause standard not intended "to supplant the material contributing cause test for every industrial injury claim"). If a compensable injury combines with a preexisting condition to cause or prolong disability or a need for treatment, the combined condition is compensable only if the compensable injury is the major contributing cause of the disability or need for treatment. ORS 656.005(7)(a)(B). In that instance,

---

[3] ORS 656.266(1) provides, in part, that

"[t]he burden of proving that an injury or occupational disease is compensable and of proving the nature and extent of any disability resulting therefrom is upon the worker."

ORS 656.005(7)(a) provides the definition for "compensable injury":

"A 'compensable injury' is an accidental injury, or accidental injury to prosthetic appliances, arising out of and in the course of employment requiring medical services or resulting in disability or death; an injury is accidental if the result is an accident, whether or not due to accidental means, if it is established by medical evidence supported by objective findings, subject to the following limitations:

"(A) No injury or disease is compensable as a consequence of a compensable injury unless the compensable injury is the major contributing cause of the consequential condition.

"(B) If an otherwise compensable injury combines at any time with a preexisting condition to cause or prolong disability or a need for treatment, the combined condition is compensable only if, so long as and to the extent that the otherwise compensable injury is the major contributing cause of the disability of the combined condition or the major contributing cause of the need for treatment of the combined condition."

the employer, not the worker, shoulders the burden of establishing that the worker has a preexisting condition and that the compensable injury is not the major contributing cause of the disability or need for treatment. ORS 656.266(2)(a).[4] To establish a preexisting condition, the employer must demonstrate that the claimant "has been diagnosed with such condition, or has obtained medical services for the symptoms of the condition," or suffers from "arthritis or an arthritic condition." ORS 656.005(24)(a)(A).[5] Thus, by proving that a claimant suffers from preexisting "arthritis,"[6] an employer is relieved of the burden of establishing that that condition was diagnosed or treated prior to the work-related injury.

In this case, the ALJ understood, based on previous board opinions, that both the meaning of the statutory term "arthritis" and whether petitioner suffered from that condition were to be "determined by medical evidence on a case by case basis. *Adam M. Karjalainen*, 57 Van Natta 172, 173 (2005)." With regard to the first issue—the meaning of "arthritis"—petitioner's treating neurosurgeon, Hajjar, opined that "arthritis" is a condition "which primarily is caused by wear and tear, degeneration and erosion, of mobile joints in the body." As to the second issue—whether petitioner suffered from arthritis—Hajjar testified that, although petitioner suffered from degenerative disc disease,

---

[4] ORS 656.266(2)(a) provides:

"Once the worker establishes an otherwise compensable injury, the employer shall bear the burden of proof to establish the otherwise compensable injury is not, or is no longer, the major contributing cause of the disability of the combined condition or the major contributing cause of the need for treatment of the combined condition."

[5] ORS 656.005(24)(a) provides, in part:

" 'Preexisting condition' means, for all industrial injury claims, any injury, disease, congenital abnormality, personality disorder or similar condition that contributes to disability or need for treatment, provided that:

"(A) Except for claims in which a preexisting condition is *arthritis or an arthritic condition*, the worker has been diagnosed with such condition, or has obtained medical services for the symptoms of the condition regardless of diagnosis[.]"

(Emphasis added.)

[6] Because we determine that petitioner in this case suffered from "arthritis," we do not need to determine whether she suffered from an "arthritic condition," and we are not called upon to define that term. For simplicity, we apply only the statutory term "arthritis."

her need for treatment arose from the work-related injury to her spine.

Respondent's medical experts also testified about both issues. Dr. Warnock, a radiologist, testified that, "if one assumes the intervertebral discs to be joints, as many do, then there's an arthritic condition." Dr. Parsons, a neurosurgeon, opined that petitioner's thoracic spine condition was "arthritis" because it was age-related and progressive over time. Parsons considered the intervertebral disc a cartilaginous body and testified that the erosion of such cartilage comes within the definition of "arthritis." Dr. Carr, an orthopedic surgeon, explained that the intervertebral disc is made up of structures similar to articular cartilage and that degenerative disc disease met the definition of "arthritis" because it "involved an inflammatory process or a degenerative condition of a soft tissue interface between two movable bones." Two other experts, Dr. Rosenbaum, a neurosurgeon, and Dr. Young, a radiologist, simply opined that petitioner's condition met the definition of "arthritis."

The ALJ found the testimony of respondent's experts more persuasive and concluded that petitioner had pre-existing "arthritis" and that the employer had met its burden to establish that petitioner's otherwise compensable injury was not the major contributing cause of her disability or need for treatment of a combined condition. The ALJ therefore entered an order denying petitioner's claim.

Petitioner appealed to the board, pursuant to ORS 656.295(1).[7] The board affirmed the ALJ's order, and petitioner sought review by the Court of Appeals, pursuant to

---

[7] ORS 656.295(1) provides:

"The request for review by the Workers' Compensation Board of an order of an Administrative Law Judge need only state that the party requests review of the order."

Such review allows the board to

"affirm, reverse, modify or supplement the order of the Administrative Law Judge and make such disposition of the case as it determines to be appropriate."

ORS 656.295(6).

ORS 656.298(1).[8] The Court of Appeals vacated the board's decision and remanded it for reconsideration in light of its opinion in *Karjalainen v. Curtis Johnston & Pennywise, Inc.*, 208 Or App 674, 146 P3d 336 (2006), *rev den*, 342 Or 473, 155 P3d 51 (2007). *Hopkins v. SAIF*, 215 Or App 356, 168 P3d 1259 (2007). In *Karjalainen,* the Court of Appeals had held that the statutory term "arthritis" has a fixed legal meaning: an "inflammation of one or more joints due to infectious, metabolic, or constitutional causes[.]" 208 Or App at 682 (quoting *Webster's Third New Int'l Dictionary* 123 (unabridged ed 2002) (internal quotation marks omitted)).

On remand, the board decided that the record established that petitioner suffered from "inflammation of a joint"[9] and, therefore, that she suffered from "arthritis." The board found that the testimony of respondent's expert, Carr, was more "fully explained and more persuasive" than that of petitioner's expert, Hajjar. The board again affirmed the order of the ALJ.

Petitioner again sought review by the Court of Appeals, which affirmed the board's order without opinion. *Hopkins v. SAIF*, 232 Or App 439, 222 P3d 1140 (2009). Petitioner filed a petition for review in this court, asserting that the term "arthritis" has a fixed legal meaning that is not dependent on case-by-case expert testimony and that the correct legal meaning is "inflammation of one or more synovial (freely articulating) joints causing a breakdown and eventual loss of cartilage, due to infectious, metabolic, or constitutional causes." The definition used by the board—"inflammation of a joint"—was so broad, petitioner contended, that it would include acute injuries such as ankle sprains, whereas, under the correct definition of "arthritis," petitioner's pre-existing condition would not qualify. Intervertebral discs

---

[8] ORS 656.298(1) provides:

"Within the time limit specified in ORS 656.295, any party affected by an order of the Workers' Compensation Board * * * may request judicial review of the order by the Court of Appeals."

[9] The board expressly decided that petitioner suffered from "inflammation of a joint," but did not reach an express conclusion that that inflammation was due to "infectious, metabolic, or constitutional causes." *Barbara L. Hopkins,* 60 Van Natta 1034, 1038 (2008)

(where the inflammation in her spine is located), petitioner asserted, are not mobile, or freely articulating, joints.

In its brief in this court, respondent agrees that the term "arthritis" is a statutory term with a fixed legal meaning. Respondent contends that the correct definition of "arthritis" is that stated by the Court of Appeals in *Karjalainen*— "inflammation of a joint due to infectious, metabolic, or constitutional causes[.]" 208 Or App at 682 (quoting *Webster's* at 123) (internal quotation marks omitted). The causes required by that definition, respondent asserts, eliminate the possibility that a sprained ankle could be considered "arthritis" because those causes imply a disruption to "the integrity of the joint and lead to degeneration over time."

■       Thus, the issue presented for our consideration is the meaning of the statutory term "arthritis." We begin by confirming that the meaning of a statutory term is a matter of law, not a question of fact for expert testimony. *See Miller v. Water Wonderland Improvement District*, 326 Or 306, 309, 951 P2d 720 (1998) (meaning of statute presents question of law). Whether one expert is more persuasive than another in a particular case can be important in resolving a factual question; it cannot, however, determine the legal meaning of a statutory term.

We also think it helpful to note, preliminarily, that the parties agree that the correct definition of the term "arthritis" includes at least the following three elements, which they take from standard and medical dictionary definitions: (1) inflammation of one or more joints, (2) due to infectious, metabolic, or constitutional causes, and (3) resulting in breakdown, degeneration, or structural change.[10] The

---

[10] In 2001, *Webster's* defined "arthritis" as follows:

"[I]nflammation of one or more joints due to infectious, metabolic, or constitutional causes—compare DEGENERATIVE ARTHRITIS, GOUT, RHEUMATOID ARTHRITIS."

*Webster's Third New Int'l Dictionary* 123 (unabridged ed 1993). Medical dictionaries defined the term similarly:

"Inflammation of a joint or a state characterized by inflammation of joints."

*Stedman's Medical Dictionary* 149 (27th ed 2000).

"Inflammation of joints."

*Dorland's Illustrated Medical Dictionary* 151 (29th ed 2000).

parties disagree about whether the term "arthritis" must be further limited to inflammation of mobile or freely articulating joints and refer us to the legislative history of the workers' compensation statutes for assistance.

■         To identify the correct interpretation of a statutory term, we begin by considering the meaning of that term and the context in which the legislature used it. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). In this case, having considered the relevant definitions of the term "arthritis," and the context in which it is used in the workers' compensation statutes, it is obvious to us that, to resolve the question presented, we also must consult the legislative history that the parties proffer. *See State v. Gaines*, 346 Or 160, 172, 206 P3d 1042 (2009) (court free to consider legislative history even if statute's text not ambiguous). It is to that source that we now turn.

The statutory provision that includes the term "arthritis," ORS 656.005(24)(a)(A), was enacted in 2001. Or Laws 2001, ch 865, § 1. The legislature had directed a Management-Labor Advisory Committee (MLAC) composed of six members, three representing management and three representing labor, to reevaluate the workers' compensation statutes and offer proposed amendments. One of the amendments that the MLAC proposed was to the definition of "preexisting condition." Before amendment, *former* ORS 656.005(24)(1999) provided:

> " 'Preexisting condition' means any injury, disease, congenital abnormality, personality disorder or similar condition that *contributes or predisposes* a worker to disability or need for treatment *and that precedes* the onset of an initial claim for an injury or occupational disease, or that precedes a claim for worsening pursuant to ORS 656.273."

---

"ARTHRITIS refers to any condition of joints of the limbs or spine associated with inflammatory or structural change. It is distinguished from arthralgia which simply implies joint pain with or without any inflammatory or structural change. The two main categories of arthritis are osteoarthritis, in which the primary change is thought of as mechanical failure of articular cartilage, and rheumatoid arthritis, in which the primary problem is a chronic inflammation of the synovial lining, of joints, tendon sheaths and bursae. * * * Spondarthritis refers to an inflammatory arthritis with involvement of the spine and is often associated with the HLA B27 tissue type."

*Black's Medical Dictionary* 42 (39th ed 1999).

(Emphases added.) Under that provision, an employer could establish that a worker had a preexisting condition by showing that the worker had a condition that predisposed him or her to disability or need for treatment and that that condition preceded the work-related injury at issue.

Senate Bill (SB) 485 (2001) changed the definition of "preexisting condition" to the following:

> " 'Preexisting condition' means, for all industrial injury claims, any injury, disease, congenital abnormality, personality disorder or similar condition that contributes to disability or need for treatment, provided that:

> "(A) Except for claims in which a preexisting condition is arthritis or an arthritic condition, the worker has been diagnosed with such condition, or has obtained medical services for the symptoms of the condition regardless of diagnosis[.]"

Under the amended definition, an employer could not establish a preexisting condition unless it proved either that the worker previously had been diagnosed or treated for that condition or that the condition was within the meaning of the terms "arthritis" or "arthritic condition."

In written testimony, John Shilts, an MLAC member, stated that the reason for the "arthritis" exception was the "employer's desire to not be held responsible for conditions that arise out of aging." Testimony, Senate Committee on Business, Labor and Economic Development, SB 485, Jan 31, 2001, Ex A at 3. When asked about the policy decision underlying the arthritis exception, Shilts, testifying before the House Committee on Business, Labor and Consumer Affairs, responded that there was "a strong interest on the management side, and labor agreed to this, to not pay for the aging process." Tape Recording, House Committee on Business, Labor, and Consumer Affairs, SB 485, May 15, 2001, Tape 114, Side B.

As a result of its significance, the meaning of the term "arthritis" was quite a contentious topic. The original draft of SB 485 contained the following definition of that term:

"For the purpose of this paragraph only, 'arthritis' or 'arthritic condition' means inflammation of a joint, usually accompanied by pain, swelling and frequently, changes in structure."

Bill File, Senate Committee on Business, Labor and Economic Development, SB 485, Jan 25, 2001 (draft bill). However, the MLAC members did not agree that that definition was appropriate and removed it from the bill. *See* Testimony, Senate Committee on Business, Labor and Economic Development, SB 485, Feb 21, 2001, Ex B at 1 (statement of John Shilts) ("There was controversy about the definition as written."). When questioned about that decision, Shilts and fellow MLAC member J. L. Wilson indicated that there already was case law that defined the term and that the intention of the committee was that the existing law discussing arthritis as a basis for the denial of claims would remain unchanged. Tape Recording, Senate Committee on Business, Labor and Economic Development, SB 485, Feb 21, 2001, Tape 32, Side B.

That assertion was repeated by management attorney Jerry Keene, who testified that the Senate committee had called on him to act as an observer of the MLAC process and to create a thorough record of the legislative intent. Tape Recording, Senate Committee on Business, Labor and Economic Development, SB 485, Mar 14, 2001, Tape 49, Side A. Keene testified that the MLAC left the meaning of the term "arthritis" undefined "on purpose." He stated that workers' compensation practitioners had an "idea or understanding" of what those terms meant and that the bill did not change that prior usage. There was no consensus, he stated, to either restrict or expand that meaning. Tape Recording, Senate Committee for Business, Labor, and Consumer Affairs, SB 485, Mar 14, 2001, Tape 50, Side A. Keene also predicted that, under a common-law approach, the board eventually would supply a definition of those terms that would be satisfactory. Tape Recording, Senate Committee on Business, Labor and Economic Development, SB 485, Feb 21, 2001, Tape 33, Side B. According to Keene, the problem with the definition that originally had been included in the proposed amendment was that it was based on medical dictionary definitions. Some MLAC members believed that

those definitions were too narrow because they did not account for the entire constellation of conditions that could be considered "arthritic," whereas other members believed that those definitions were too broad and that a symptomatic definition was preferable. *Id*. But leaving the term undefined also was problematic. Keene acknowledged that, at that time, there was no one definition of "arthritis" in the case law but, rather, "a trend." *Id*.

When the bill reached the Senate floor, Senator Beyer said that he expected that judges would define the term "arthritis" based on "experience and traditional usage." Tape Recording, Senate Floor Proceedings, Mar 22, 2001, Tape 93, Side B. Beyer predicted that the case law probably would define "arthritis" to include such conditions as "degenerative joint disease" and other "compromises in the structure surrounding arthritic joints." *Id*.

Because those who testified before the legislature when SB 485 was adopted indicated that existing case law could give some meaning to the term "arthritis," we have perused that case law, but find it, as Keene acknowledged we would, less than definitive. The term "arthritis" had not been used in the workers' compensation statutes before the enactment of SB 485, and, as a result, no appellate court had had occasion to interpret it. The most that it appears that either appellate court had done was to describe how medical experts had used the term "arthritis" in their diagnoses. In some cases, experts associated arthritis with inflammation of the joints. *See, e.g., Garcia v. Boise Cascade Corp.*, 103 Or App 508, 511, 798 P2d 265 (1990) (describing "low-grade inflammation" and "changes * * * of osteoarthritis" as commonly occurring conditions); *Havice v. SAIF*, 80 Or App 448, 450, 722 P2d 742 (1986) (describing arthritic condition as "swelling in the joints" of claimant's hands); *Wells v. Wells*, 15 Or App 507, 511, 516 P2d 480 (1973) (describing "arthritic swelling" of the hands). In others, experts linked the term "arthritis" with the descriptor "degenerative." *See, e.g., Kaspar v. SAIF*, 93 Or App 246, 250, 761 P2d 1345 (1988) (claimant's "arthritis" included conditions of "spondylosis, osteoarthritis and degenerative disc disease"); *McHorse v. Portland General Electric*, 268 Or 323, 330, 521 P2d 315 (1974) (condition described as "degenerative arthritis of the hip and spine");

*Russell v. Mount Hood Railroad Co.*, 267 Or 335, 338, 517 P2d 276 (1973) ("arthritis" described as "natural degenerative changes * * * which exist because of age"); *Stubbs v. Mason*, 252 Or 547, 549, 450 P2d 773 (1969) ("arthritis" described as "chronic degenerative changes in the vertebra and intervertebral disk of the neck"); *Todd v. Occidental Life Ins. Co.*, 208 Or 634, 639-40, 303 P2d 492 (1956) (describing "arthritis" as including "deterioration or degeneration" of bone and cartilage). And in still others, experts seemed to assume that arthritis was distinct from degenerative disc disease. *See, e.g.*, *Worldmark The Club v. Travis*, 161 Or App 644, 648, 984 P2d 898 (1999) (describing claimant's back condition as "degenerative disc disease" and not arthritis); *Sheffield v. SAIF*, 50 Or App 427, 429, 623 P2d 1082 (1981) (diagnosing claimant with "arthritis and degenerative disc disease").

Our review of the legislative history of SB 485 leads us to conclude that the legislature amended the definition of "preexisting condition" to implement a compromise that had been reached between management and labor. That compromise included a new requirement that, to establish a preexisting condition, an employer must establish that the condition had been previously diagnosed or treated, but excluded "arthritis" from that requirement. In doing so, the legislature had an "idea" of the meaning of the term "arthritis" but also knew that a compromise had not been reached on how to define that term more precisely. Therefore, the legislature intentionally left the word "arthritis" undefined and understood that the task of defining it would be left to the common law, the board, and the appellate courts.

With that understanding of the legislature's intent, we conclude that we must proceed as follows. First, we must identify the various definitions or usages that the term "arthritis" had in 2001 and endeavor to identify their common elements. Those common or core elements would have been considered essential to the definition of the term "arthritis," and the legislature surely intended to include them within its meaning. After identifying those common or core elements, we will then consider the parties' arguments that we interpret the term "arthritis" to include additional elements or concepts.

In 2001, *Webster's* defined "arthritis" as follows:

> "[I]nflammation of one or more joints due to infectious, metabolic, or constitutional causes—compare DEGENERATIVE ARTHRITIS, GOUT, RHEUMATOID ARTHRITIS."

*Webster's Third New Int'l Dictionary* 123 (unabridged ed 1993). Medical dictionaries defined the term similarly:

> "Inflammation of a joint or a state characterized by inflammation of joints."

*Stedman's Medical Dictionary* 149 (27th ed 2000).

> "Inflammation of joints."

*Dorland's Illustrated Medical Dictionary* 151 (29th ed 2000).

> "ARTHRITIS refers to any condition of joints of the limbs or spine associated with inflammatory or structural change. It is distinguished from arthralgia which simply implies joint pain with or without any inflammatory or structural change. The two main categories of arthritis are osteoarthritis, in which the primary change is thought of as mechanical failure of articular cartilage, and rheumatoid arthritis, in which the primary problem is a chronic inflammation of the synovial lining, of joints, tendon sheaths and bursae. * * * Spondarthritis refers to an inflammatory arthritis with involvement of the spine and is often associated with the HLA B27 tissue type."

*Black's Medical Dictionary* 42 (39th ed 1999).

The definition in *Webster's* starts with a concept that all parties to this case consider essential to the term "arthritis": "inflammation of a joint." The medical dictionaries that we have consulted include that concept as well. We also find reference to inflammation in the appellate court cases decided before 2001. We conclude that "inflammation of a joint" is a core element of the meaning of the term "arthritis."

*Webster's* also includes, in its definition of "arthritis," the requirement that inflammation be "due to infectious, metabolic, or constitutional causes." We agree with the parties that those causes operate to exclude traumatic injury as a cause of "arthritis" and that the legislature intended such

an exclusion. Before enactment of SB 485, the term "preexisting condition" applied to all conditions that preceded a work-related injury and predisposed a worker to disability or need for treatment. In enacting SB 485, the legislature required that the worker have received prior diagnosis or treatment for all predisposing conditions except "arthritis," presumably because "arthritis" may occur slowly over time as a part of the aging process and thus may not have been immediately diagnosed or treated. There is no indication in the legislative history that the legislature intended to treat traumatically inflicted inflammation of a joint, such as may occur when one sprains an ankle, similarly. The appellate cases decided before 2001 do not demonstrate that medical experts considered traumatically caused inflammation of a joint to be "arthritis." We conclude that a core element of the definition of "arthritis" is that inflammation of the joint occur over time and that the *Webster's* definition requiring that the inflammation of a joint result from "infectious, metabolic, or constitutional causes" carries that concept.

Both parties suggest an additional element to a correct definition of "arthritis": that the condition results in some breakdown, degeneration, or structural change. The definition of "arthritis" in *Black's Medical Dictionary* includes that concept:

> "ARTHRITIS refers to any condition of joints of the limbs or spine associated with inflammatory or structural change. It is distinguished from arthralgia which simply implies joint pain with or without any inflammatory or structural change. * * *."

*Black's Medical Dictionary* 42 (39th ed 1999). Respondent also finds that requirement in the *Webster's* definition, explaining that the requirement that the inflammation of the joints be caused by "infectious, metabolic, or constitutional causes" means that the inflammation must "disrupt the integrity of the joint and lead to its degeneration over time." Expert testimony recounted in appellate cases decided before SB 485 was enacted also referred to "arthritis" as "degenerative." We conclude that a core element of the definition of "arthritis" is that inflammation of a joint result in breakdown, degeneration, or structural change.

Petitioner proffers another element to the definition of "arthritis" for our consideration. She argues that that term should be limited to inflammation of moveable, or what she calls "freely articulating," joints. Petitioner asserts that the facet joints of the back are freely articulating and can be affected by arthritis, but that the intervertebral discs of the spine are not and cannot. Petitioner bases that argument on medical dictionary definitions, which, she asserts, "suggest articular or mobile joints" as the usual site for "arthritis." However, the definitions to which petitioner points us are definitions of "osteoarthritis." *See Dorland's Illustrated Medical Dictionary* 1333 (30th ed 2003) (defining "osteoarthritis" as "characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane"); *Stedman's Medical Dictionary* 1107 (25th ed 1990) and 1388 (28th ed 2006) (defining "osteoarthritis" as "characterized by erosion of articular cartilage"). Perhaps petitioner is correct in her definition of "osteoarthritis," but the legislature did not limit the term "arthritis" to a particular form of "arthritis"—"osteoarthritis."

Petitioner also cites decisions of the board for the proposition that the board does not consider intervertebral discs to be joints. However, those cases merely demonstrate that an employer must establish, by expert testimony, that a claimant suffers from inflammation of whatever joint or joints it contends are affected by the arthritic condition. *See, e.g., Terry L. George*, 61 Van Natta 1539, 1542 (2009) (arthritic condition not proved when medical expert asserted claimant "did not have an 'inflammatory' arthritic back condition"); *Brett J. Cameron*, 61 Van Natta 1515, 1518 (2009) (arthritic condition not proved when record contains no evidence of "either a joint or inflammation" but only conclusory references to arthritic condition); *Danny Kalaveras*, 61 Van Natta 964, 967 (2009) (arthritic condition not proved when medical testimony described disc as "desiccated" or "dried up" and not inflamed).

■ We do not agree with petitioner that the legislature intended to limit "arthritis" to the inflammation of mobile joints or to certain joints in the back and not to others. We

cannot find that limitation in the definitions of "arthritis" in use or in the appellate cases that had been decided in 2001.

■ Neither party proposes that we include other elements in the definition of the statutory term "arthritis," and we decline to do so. We conclude that, when the legislature adopted SB 485, it intended the term "arthritis" to mean the inflammation of one or more joints, due to infectious, metabolic, or constitutional causes, and resulting in breakdown, degeneration, or structural change.

■ The question remains whether, given that definition, the board erred in deciding that petitioner in this case suffers from "arthritis." That depends, of course, on whether there is substantial evidence in the record to support a conclusion that petitioner has "arthritis" as we have now defined that term. *See* ORS 656.298(7); ORS 183.482(8)(c);[11] *Erck v. Brown Oldsmobile,* 311 Or 519, 524, 815 P2d 1251 (1991) (Court of Appeals and this court review agency decisions for legal issues under standards set forth in ORS 183.482(7) and (8)).

The board expressly concluded that the evidence in the record was sufficient to establish that petitioner suffered from the "inflammation of a joint"; the board did not expressly conclude that the evidence was sufficient to establish that that inflammation was due to infectious, metabolic, or constitutional causes or that it resulted in breakdown, degeneration, or structural change. However, respondent presented substantial evidence that petitioner's condition was a result of progressive degeneration that manifested in the erosion of the intervertebral discs in her spine. Although petitioner presented evidence from her treating neurologist that the inflammation of her discs was not damage to a joint and was caused by acute trauma, there was substantial evidence to support a contrary conclusion. *See SAIF v. Sprague,*

[11] ORS 656.298(7) provides that judicial review of Workers' Compensation Board orders "shall be as provided in ORS 183.482(7) and (8)."

ORS 183.482(8)(c) provides:

"The court shall set aside or remand the order if it finds that the order is not supported by substantial evidence in the record. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."

346 Or 661, 674-75, 217 P3d 644 (2009) (affirming board deci-sion when there was substantial evidence in record support-ing board's factual findings). Consequently, the board did not err in concluding that petitioner had preexisting "arthritis" or in denying petitioner's claim for benefits.[12]

The decision of the Court of Appeals and the order of the Workers' Compensation Board are affirmed.

---

[12] Having concluded that petitioner suffered from pre-existing "arthritis," the board went on to consider whether respondent had established that petitioner's workplace injury was not the major contributing cause of her disability or need for treatment of the combined condition and concluded that it had. Petitioner does not challenge that conclusion in this court.