Argued and submitted May 20, 2014, reversed and remanded December 23, 2015, petition for review denied March 24, 2016 (358 Or 833)

In the Matter of the Compensation of
Theron E. Hutchings, Claimant.

Theron E. HUTCHINGS,
*Petitioner,*

*v.*

AMERIGAS PROPANE
and Amerigas Propane, Inc.,
*Respondents.*

Workers' Compensation Board
1003960, 1003489; A151719

365 P3d 636

James S. Coon argued the cause for petitioner. With him on the brief was Swanson Thomas Coon & Newton.

Rebecca A. Watkins argued the cause for respondents. With her on the brief were Deborah L. Sather and Sather, Byerly & Holloway, LLP.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

Claimant challenges a Workers' Compensation Board order that upheld employer's "combined condition" denial and employer's denial of claimant's request for medical services.[1] On judicial review, claimant contends that employer's combined condition denial was improper because employer failed to prove that claimant had a preexisting condition at the time of his work injury and, thus, the preexisting condition identified by employer could not have been the major contributing cause of claimant's disability and need for treatment. As for employer's medical services denial, claimant argues that his referral to an orthopedic surgeon for an evaluation of the nature and extent of his work injury should have been covered under ORS 656.245(1)(a) because it was "directed to" his compensable injury. We conclude that the record does not support the board's conclusion regarding the existence of a preexisting condition and that, consequently, employer's medical services denial was likewise in error. Accordingly, we reverse and remand the board's order.

To provide necessary context to the factual and procedural history that follows, we provide the legal framework that governs employer's combined condition denial. Generally, under the Workers' Compensation Law, a "compensable injury" includes an accidental injury "arising out of and in the course of employment requiring medical services or resulting in disability or death." ORS 656.005(7)(a). However, where an "otherwise compensable injury" combines with a "preexisting condition" to cause or prolong disability or the need for treatment, the resulting "combined condition" is compensable only as long as the otherwise compensable injury is the major contributing cause of the disability or need for treatment of the combined condition. *Corkum v. Bi-Mart Corp.*, 271 Or App 411, 420-21, 350 P3d 585 (2015). In an industrial injury claim, a "preexisting condition" is an "injury, disease, congenital abnormality, personality disorder or similar condition that *contributes to disability or need for treatment*," provided that the worker has been diagnosed with the condition, or has obtained medical services for the

---

[1] For ease of reference, we refer to employer and employer's workers' compensation insurance carrier as "employer" throughout this opinion.

symptoms of the condition (regardless of diagnosis) before the initial injury.[2] ORS 656.005(24)(a)(A), (B)(i) (emphasis added). However, "a condition does not contribute to disability or need for treatment if the condition merely renders the worker more susceptible to the injury." ORS 656.005(24)(c). And finally, after accepting a combined condition, the employer may deny it if the otherwise compensable injury ceases to be the major contributing cause of the combined condition. ORS 656.262(6)(c), (7)(b).

The following facts are undisputed. In early 2009, unrelated to work, claimant experienced a loss of sensation in his left leg, along with neck and back pain. He visited Dr. Conklin, who ordered an MRI and referred claimant to Dr. Camp. After further imaging showed substantial abnormality of the cervical spine, including injury at the C6-7 level indenting the anterior cervical cord, Camp diagnosed claimant with "cervical spondylotic myelopathy referable to cord compression" at the C5-6 and C6-7 levels. An MRI showed a disc protrusion and osteophytic spurring at the C6-7 level and spondylotic degenerative changes at C3-4 through C5-6. As a result, Camp performed an anterior cervical discectomy and fusion at C5-6 and C6-7 on April 8, 2009. Claimant recovered well from the surgery, including increased range of motion in his neck and increased sensation in his left leg. Accordingly, he returned to light work duty shortly after the surgery, and full work duty in July 2009.

At the end of that month, on July 29, as claimant drove on a rural road, the front of his work truck dipped very suddenly and his "air-shock" seat catapulted him upwards, causing him to strike his head on the ceiling of the truck's

---

[2] The requirement that a worker has been diagnosed or obtained medical services before the initial injury does not apply when the preexisting condition is arthritis or an arthritic condition. ORS 656.005(24)(a)(A). Both parties acknowledge that claimant's spondylosis is considered an arthritic condition, but they assert that that fact is inconsequential to the issues on judicial review because, as discussed below, claimant is challenging whether there was any evidence of a cervical breakdown around the fusion that had actually become a "condition that contributes to disability or need for treatment" as of July 29, 2009. Further, the board's analysis of the issues did not implicate ORS 656.005(24)(a)(A), and thus, the arthritic nature of spondylosis plays no part in our analysis on judicial review.

cab. He immediately experienced pain in his neck. About a month later, claimant visited Conklin for "cervical symptoms." A cervical X-ray showed the "C5 through C7 fusion" and "no acute abnormality." Conklin referred claimant to Camp for further evaluation of the "nature and extent" of claimant's injuries, but claimant's initial attempts to secure appointments with Camp were unsuccessful.

Claimant filed a workers' compensation claim in August 2009, which employer denied in October 2009. However, employer rescinded its denial and accepted a "nondisabling cervical strain" in January 2010. At employer's request, Dr. Berselli conducted an independent medical examination (IME) in February 2010. In May, employer modified its acceptance to include a "nondisabling cervical strain, combined with preexisting spondylosis of the cervical spine at C5-6 and C6-7" effective the date of injury. That same day, employer issued a denial, stating:

> "The medical evidence establishes your accepted nondisabling cervical strain ceased to be the major contributing cause of your disability and need for treatment of your combined condition as of February 9, 2010. The evidence establishes your preexisting cervical spondylosis of the cervical spine at C5-6 and C6-7 is the major contributing cause of your disability and need for treatment of the combined condition. This denial is based on Dr. Robert Berselli's independent medical examination. Dr. Bryan Conklin disagreed with the evaluation."

Meanwhile, claimant made additional unsuccessful attempts to schedule an appointment with Camp. On May 5, claimant asked employer to authorize Conklin's referral of claimant to Camp or to indicate why employer refused to do so. Employer took the position that claimant's disability and need for treatment was related to a noncompensable claim and that there was no requirement that an employer issue preauthorization for a consultation on a nondisabling or noncompensable claim.

Shortly thereafter, claimant disputed the combined condition denial and employer's failure to authorize an examination by Camp for diagnostic purposes. Those disputes were consolidated for hearing. An administrative law judge (ALJ) held a hearing at which the parties introduced

medical evidence related to claimant's condition. Of particular importance to the issues before us is medical evidence from three orthopedists—Drs. Gritzka, Berselli, and Gripekoven. Accordingly, we summarize that evidence to lend context to and aid our analysis of the board's ultimate decision to uphold employer's combined condition denial.

As noted, Berselli conducted an IME in February 2010, after which he concluded that a diagnosis of cervical strain was sufficient to describe all medical conditions attributable to claimant's on-the-job injury, and that claimant had preexisting conditions involving his neck and back—specifically, "spondylosis of the cervical spine at the C5-6, C6-7 levels" and "damage to the long tracks of the cervical cord subserving pain and temperature in the left lower extremity." Berselli opined that claimant did not have a "normal cervical spine" on July 29, 2009, when he sustained "an acute axial loading injury to the cervical spine, as well as an acute musculoligamentous strain of the cervical spine secondary to that injury." Further, Berselli concluded that claimant's cervical strain became medically stationary four months from the date of injury.

In a supplemental report completed almost four months after the IME, Berselli explained further that a cervical fusion

"is not 100% guaranteed to relieve all symptoms. In many cases, a patient will experience relief of all symptoms for a period of time after the procedure. However, the patient may eventually begin to experience pain and discomfort associated with the fused discs and scar tissue. The scar tissue can cause popping, clicking, snapping etc. in the neck with movement, discomfort, pain, limited range of motion, and tenderness among other findings. Such is not uncommon when you replace a disc by fusing two bones together."

Berselli also explained that Conklin's chart notes from January and May 2010, which indicated that claimant was experiencing neck stiffness, soreness, pain, and "grinding" two to three inches below the surgical site, could be attributed to the preexisting cervical spondylosis and the fusion procedure.

Gritzka reviewed claimant's medical records, but did not personally examine him. He disagreed with Berselli's diagnosis of cervical strain, concluding that, because Berselli did not examine the biomechanics of the axial loading injury to determine what damage it might have caused, he had simply "resorted to blaming ongoing symptoms on the preexisting condition, despite evidence that this preexisting condition had been successfully treated in April 2009." Gritzka concluded that "[i]t is more likely that the axial loading injury caused a buckling of the cervical column and some subluxation and instability that continue to cause claimant's cervical pain." He further concluded that the nature of the injury—a vertical loading injury—typically results in compression fracture or buckling of the spine. Gritzka explained that the compression of the spine could tear or stretch ligaments causing a sprain and disruption throughout the cervical spinal column—not just a simple strain.

As for claimant's "preexisting" spondylosis, Gritzka opined that claimant does not have "that condition at those levels anymore." Rather, in Gritzka's view, claimant's diagnosable condition at C5-6 and C6-7 is "spinal fusion, but that would not have combined with the injury because, if anything, the fusion would have protected against any injury to the fused level." Gritzka also disagreed with Berselli that claimant's need for treatment was due to a preexisting condition, asserting that, given the results of claimant's surgery, "it is unlikely that claimant would have the ongoing cervical problems he has now without an intervening event." Gritzka doubted that claimant's symptoms were a natural consequence of his cervical fusion, noting that, although people with fusions can develop additional problems at levels above and below the fusion, it usually takes five to 10 years for that to happen. Accordingly, it seemed to Gritzka that it was too early for claimant to be suffering from any sort of "adjacent level syndrome." Gritzka concluded that, more likely than not, claimant's work accident remained the major contributing cause of his need for treatment.

Some months later, Gritzka reviewed medical records from June 23, 2010, and August 16, 2010, from which he

gleaned that claimant's ongoing symptoms and reports of extreme pain suggested that claimant "likely has some ongoing instability from the vertical loading work event that cause chronic pain with subtle movement and exacerbation of extreme pain when claimant moves in certain ways."

Shortly before the hearing, employer provided deposition testimony from Gripekoven in which he discussed his review of the medical evidence in the record, including the reports of Berselli and Gritzka. Gripekoven diagnosed claimant with degenerative disc disease in his cervical spine at multiple levels, and a successful two-level fusion at the C5-6 and C6-7 levels with successful decompression of the spinal cord that had been neurologically compromised before the fusion. He noted that the compression was "relieved" by the fusion.

As for the work injury, he agreed with Berselli that claimant had suffered a cervical strain. He explained how the downward forces caused by the mechanism of the injury could have sprained the small facet joints above and below the fusion. He noted that the discs above and below the fusion site are "at risk" because the mechanics of the cervical spine are disrupted and they are "susceptible to injury." He explained that, "if you cut out motion at two levels, then you're going to have to move more above and below the fusion and, therefore, put on greater stresses which can lead to mechanical breakdown." He described how it is very common with the passage of time to see degenerative changes and breakdown of the discs above and below the fusion. Further, he noted that claimant's fusion stabilized the conditions "that existed prior to and led up to the fusion, but they have created a secondary problem, which is the susceptibility of injury and the inevitable breakdown of the discs above and below the fusion."

As to what was the major contributing cause of claimant's disability or need for treatment, Gripekoven noted that, "at this point in time, which is about a year and a half after his surgery," the progressive breakdown of the disc facet joint complexes above and below the fusion were the major contributing cause—not the acute injury suffered on July 29, 2009.

Gripekoven also addressed Gritzka's opinion that it generally takes five to 10 years for the discs above and below the fusion to breakdown by noting that that time frame was a "highly arbitrary" number. He explained that it depends on the individual and multiple other factors, and that, it could happen much faster for some people. He opined that the pathological changes in the joints and the ultimate breakdown of the disc take place incrementally. He disagreed with Gritzka's explanation of claimant's injury—noting that there was no evidence of "buckling" from the imaging, nor was there evidence of hypermobility, instability, or significant soft tissue injury. Accordingly, he concluded that, in his view, claimant's strain would have healed within a four to six month period.

After the hearing, the ALJ upheld the combined condition denial, concluding that the case presented a complex medical question, and ultimately accepting employer's view of the medical evidence as more persuasive. The ALJ found that Berselli's report and Gripekoven's testimony established that claimant had a preexisting condition that was the major contributing cause of his disability and need for treatment as of the effective date of the combined condition denial. The ALJ, however, set aside the medical services denial as unreasonable, concluding that they were diagnostic services necessary to determine the cause or extent of a compensable injury, and awarded attorney fees to claimant for the denial of services.

Claimant sought review from the board, challenging the combined condition denial. Employer cross-petitioned for review, challenging the ALJ's conclusion that it had unreasonably denied medical services.

To the board, claimant argued that employer had failed to prove that he had a preexisting condition that had combined with his otherwise compensable cervical strain. First, claimant argued that the medical evidence established that his surgery had eliminated his spondylosis, and as something that no longer existed, it could not qualify as a preexisting condition. Second, he asserted that his "cervical fusion" could not qualify as a preexisting condition because the medical evidence established that it merely rendered him

more susceptible to injury, and, under ORS 656.005(24)(c), a condition that merely renders the worker more susceptible to injury does not "contribute to disability or need for treatment."

Employer asserted that the medical evidence, specifically the findings of Berselli and Gripekoven, established that claimant's cervical spine was compromised before and after his surgery. According to employer, Berselli had explained that the fusion did not resolve several preexisting conditions (facet arthritis and spinal cord damage at C6-7), and Gripekoven had emphasized that claimant had cervical spondylosis and likely suffered from accelerated disc degeneration at the levels adjacent to the fusion site because of the surgery to treat claimant's spondylosis. Employer asserted that, therefore, the medical evidence provided a comprehensive assessment of claimant's preexisting condition related to the consequences of having a two-level surgical fusion.

As for whether claimant's condition merely made him more susceptible to injury—as opposed to contributing to his disability and need for treatment—employer asserted that, although Gripekoven had stated that claimant's surgery made him "more susceptible" to injury, he had also opined that post-surgical scarring and the fusion caused the "inevitable breakdown" of the surrounding structures and likely caused claimant's neuropathy. Similarly, according to employer, Berselli had explained that claimant's surgery resulted in the development of scar tissue, which, coupled with spondylosis, caused "popping, clicking, snapping etc, in the neck with movement, discomfort, pain, limited range of motion, and tenderness." Employer argued that Berselli found that those symptoms, which were prevalent in January and May 2010, were related to the preexisting spondylosis and fusion rather than the cervical strain. Finally, employer pointed out that Berselli and Gripekoven had found Gritzka's opinion "lacking in several respects."

The board upheld the combined condition denial. Preliminarily, the board touched on whether claimant's fusion surgery had "resolved" his spondylosis. The board noted that Gritzka opined that claimant's surgery had resolved his spondylosis at C5-6 and C6-7 and that Gripekoven stated that the "things that led to the fusion"

had "in large part" resolved by the time of the injury. The board also acknowledged that Berselli had identified spondylosis as the preexisting condition that had combined with claimant's cervical strain. However, the board declined to resolve, as a factual matter, whether claimant still suffered from spondylosis after his surgery. Instead, the board noted that even if it assumed that claimant's spondylosis had been resolved by the fusion, "the 'preexisting condition' component of the accepted combined condition satisfied the requirements of ORS 656.005(24)(a)."

The board reasoned that it did not matter if the spondylosis had been "resolved" because all of the medical experts agreed that the fusion surgery was performed to treat claimant's spondylosis. Accordingly,

> "insofar as the cause of claimant's disability or need for treatment can be attributed to the fusion, the cause of claimant's disability or need for treatment can also be attributed to the spondylosis. Therefore, even if the spondylosis condition had been treated by the fusion, it nevertheless 'contributes to disability or need for treatment' if the fusion 'contributes to disability or need for treatment.'"

In other words, the board concluded that, if the evidence showed that a condition has been treated, yet the treatment created disability or the need for treatment, then the employer has demonstrated the existence of a preexisting condition under ORS 656.005(24)(a). According to the board, because the medical evidence indisputably established that claimant underwent fusion surgery to treat his spondylosis, if the medical evidence established that the fusion surgery created disability or the need for treatment, then employer had established a preexisting condition.

Next, the board examined whether claimant's "preexisting spondylosis/fusion" contributed to claimant's disability or need for treatment, or whether it merely rendered him more susceptible to injury. On that point, the board relied exclusively on Gripekoven's testimony, concluding that his testimony established that the fusion had caused abnormal forces on the areas adjacent to the fusion, as well as possible post-operative scarring and "residuals." That evidence, according to the board, explained how the fusion had

*actually caused*, rather than merely created a susceptibility to, injury. The board noted that Gripekoven had used the term "susceptibility" when he explained the consequences of fusion on the adjacent discs, but emphasized that Gripekoven had also explained that the fusion resulted in a progressive breakdown of the disc facet complexes above and below the fusion. Finally, the board concluded that, because there was evidence that the cervical strain had ceased to be the major contributing cause of the combined condition, employer had appropriately issued a combined condition denial.

We review the board's determination of legal issues for errors of law, and its determination of factual issues for substantial evidence. ORS 183.482; ORS 656.298(7). A substantial evidence challenge also requires us to review the board's order for substantial reason to ensure that the order "articulates the reasoning that leads from the facts found to the conclusions drawn." *Salosha, Inc. v. Lane County*, 201 Or App 138, 143, 117 P3d 1047 (2005).

Claimant's first assignment of error challenges the board's decision upholding employer's combined condition denial in two respects. First, claimant argues that, as a matter of law, because employer identified "cervical spondylosis of the cervical spine at C5-6 and C6-7" as claimant's preexisting condition, the board could not uphold employer's combined condition denial based on evidence related to whether claimant's *fusion* created disability or the need for treatment. Instead, claimant asserts that cervical spondylosis and a C5-C7 fusion are separate conditions and, essentially, employer is limited to proving the existence of the condition expressly referenced in its combined condition denial. Here, claimant maintains that, because the medical evidence demonstrated that his cervical spondylosis had been resolved, the board could not uphold a combined condition denial that identified cervical spondylosis as the preexisting condition.[3]

---

[3] At least arguably, the medical evidence presented a dispute about whether claimant's spondylosis had been "resolved" by the fusion. However, because the board did not resolve that factual dispute—instead concluding that it did not matter—for purposes of reviewing the board's order, we assume that the fusion resolved claimant's spondylosis. To the extent employer asserts that the board resolved that medical dispute in employer's favor, we find no support for that position in the record.

In support of that legal proposition, claimant relies on *Tattoo v. Barrett Business Service*, 118 Or App 348, 847 P2d 872 (1993). According to claimant, *Tattoo* establishes the rule that employers are bound by the express text of their combined condition denials. He asserts that *Tattoo* undermines the board's expressed view that cervical spondylosis and the treatment of the spondylosis can be viewed "as a package" when evaluating whether employer carried its burden of demonstrating a preexisting condition under ORS 656.005(24)(a). He explains that, because it "is a matter of consequence" when a condition, through medical treatment, the passage of time, or some other reason, has become a "different condition," the board's explanation is wrong.

Employer defends the board's reasoning, arguing that the board properly considered the identified preexisting condition and the treatment for that condition when determining if the employer proved the existence of a preexisting condition. As applied here, employer maintains that claimant's spondylosis qualifies as a preexisting condition under the statutory definition because it was previously diagnosed and treated and, according to the medical evidence, the spondylosis and the residual effects of the surgery to treat it contributed to claimant's need for treatment. Employer disputes the idea that the text of an acceptance or denial is so strictly construed against the employer, and cautions that claimant's argued position would lead to a rule that the surgical repair of any condition would exempt the condition from qualifying as a preexisting condition, even if the surgery generated its own residuals that could combine with a subsequent injury.

We begin by noting that we do not find support for claimant's position in the relevant statutes. That is, the statutes that define preexisting condition and govern combined condition denials do not expressly foreclose what the board concluded here—that an employer could satisfy its burden under ORS 656.266(2)(a) to "establish the otherwise compensable injury is not, or is no longer, the major contributing cause of the disability of the combined condition or the major contributing cause of the need for treatment of the combined condition" through evidence that the treatment of the identified preexisting condition contributes

to disability or the need for treatment. A "preexisting condition" is broadly defined as an "injury, disease, congenital abnormality, personality disorder or similar condition that contributes to disability or need for treatment." ORS 656.005(24)(a). ORS 656.262(7)(b), which directs employers to issue combined condition denials, simply provides that, once a worker's claim has been accepted, the employer "must issue a written denial to the worker when the accepted injury is no longer the major contributing cause of the worker's combined condition before the claim may be closed." And, as noted, the employer's burden is to establish that the otherwise compensable injury "is not, or is no longer, the major contributing cause of the disability *** or *** need for treatment of the combined condition." ORS 656.266(2)(a). Thus, when those statutes are considered together, the legislature's focus (and thus the board's focus) is on whether the employer has established that the otherwise compensable injury is not the major contributing cause—it is not whether the employer has proven that the exact preexisting condition identified in the combined condition denial is the major contributing cause. Finally, there is no statute that prescribes a particular manner for acceptance of a combined condition. *Columbia Forest Products v. Woolner*, 177 Or App 639, 646, 34 P3d 1203 (2001). Accordingly, we do not view the statutory scheme as requiring the board to limit the employer's ability to prove the legitimacy of its combined condition denial in the very narrow way urged by claimant. We emphasize that our conclusion is limited to the narrow circumstances of this case, where the board has upheld a combined condition denial based on evidence that (1) the treatment of the preexisting condition expressly named in the combined condition denial created disability or a need for treatment, and (2) the otherwise compensable injury is no longer the major contributing cause.[4]

We also conclude that our holding in *Tattoo* does not require us to reverse the board's order in this case. In

---

[4] We note that, in other workers' compensation contexts, we have explained that a notice of acceptance or notice of denial need not "employ the specific words 'combined condition'" to constitute an acceptance of a combined condition. *SAIF v. Allen*, 193 Or App 742, 749, 91 P3d 808 (2004) (quoting *Columbia Forest Products*, 177 Or App at 647). Rather, the scope of the acceptance or denial "does not depend solely on the words it uses but also on the context in which it is made." *Id.*

*Tattoo*, the claimant had sought payment for chiropractic care allegedly necessitated by an injury, which the employer denied because the medical information indicated that current chiropractic care is not reasonable and necessary. 118 Or App at 350. At a subsequent hearing, the employer's claims examiner testified that the denial was intended to cover past treatment *and* prospective treatment because she did not believe that it was necessary to issue subsequent denials for future treatment. *Id.* at 351. The claimant argued to the board that the examiner's testimony showed that the employer had impermissibly denied prospective chiropractic care. The board concluded that the denial was limited to "current chiropractic care." On review, the claimant asserted that, when the board's written denial was considered in conjunction with the examiner's testimony, the board erred in not concluding that the employer was also denying prospective care. We upheld the board's decision, concluding that the testimony of the examiner was irrelevant because "employers are bound by the express language of their denials." *Id.* at 351. We noted that, otherwise, "an employer could change what it had expressly said in a denial to the detriment of all parties who have relied on the language." *Id.* at 352.

At first blush, *Tattoo* appears to support claimant's position. But, in subsequent cases, we have limited the scope of its holding. In *Columbia Forest Products*, we rejected the claimant's argument based on *Tattoo* that an employer must use "magic words" to signify the acceptance of a combined condition. 177 Or App at 645. Instead, we noted that, in workers' compensation cases generally, evidence need not consist of "magic words" to adequately support the board's findings. We also rejected the claimant's argument that, to enhance predictability and clarity in the administration of claims, a notice of acceptance must be strictly construed against the employer. We noted that the scope of an employer's acceptance has always been an issue of fact. *Id.* at 646. Accordingly, we concluded that a notice of acceptance that did not use the specific words "combined condition" was not insufficient as a matter of law to constitute an acceptance of a combined condition. *Id.* at 647. We distinguished *Tattoo*, by explaining that the decision stands for the limited

principle that "an employer may not accept a condition and later assert a position that contradicts the express language of its acceptance." *Id.* at 645.

It follows that the question *Tattoo* presents in this case is whether employer has asserted a position that "contradicts the express language" of its denial. We conclude that it has not. Employer's combined condition denial identified "preexisting cervical spondylosis" as the condition that had combined with the accepted cervical strain. Employer has not asserted a position that contradicts the express terms of its denial. Instead, employer's position throughout the litigation has been that claimant's preexisting spondylosis was not resolved by the fusion surgery. That employer also sought to prove that claimant's treatment for spondylosis (*i.e.,* the fusion) contributed to claimant's disability or need for treatment is not a position that contradicts the express language of employer's combined condition denial. Accordingly, we reject claimant's first argument in his first assignment of error.

Claimant's second argument attacking employer's combined condition denial is directed at whether there is evidence in the record that, at the time of his work injury, his fusion surgery had caused anything more than a susceptibility to future breakdown of the spine at the levels above and below the fusion. That is, claimant asserts that, even if the board could consider the effects of the fusion, the record relied on by the board did not support the factual conclusion that the fusion had created actual injury by the time of claimant's July 29, 2009, compensable injury.

As noted, employer had the burden to show that claimant had a preexisting condition and that the preexisting condition—not claimant's otherwise compensable injury—was the major contributing cause of claimant's disability and need for treatment. However, a condition that merely renders a worker more susceptible to a work-related injury is deemed not to "contribute to disability or need for treatment." ORS 656.005(24)(c). Accordingly, if a condition merely renders the worker more susceptible to injury, it is not a preexisting condition, and plays no role in the "major contributing cause analysis." *Vigor Industrial, LLC v. Ayres,*

257 Or App 795, 803, 310 P3d 674 (2013), *rev den*, 355 Or 142 (2014). "Our role on review of the board's evaluation of expert medical opinions is to determine whether the evaluation is supported by substantial evidence, that is, evidence that, considering the record as a whole, would permit a reasonable person to make the findings." *The Boeing Company v. Cole*, 194 Or App 120, 123, 93 P3d 824 (2004).

The board concluded that the fusion "residuals" had caused actual injury to the adjacent disc levels by the time of claimant's work injury. Accordingly, the board decided that claimant had a preexisting condition because the treatment for the spondylosis did more than create a mere susceptibility to injury; it had caused injury as of the date of claimant's work injury. Claimant notes that the board relied solely on Gripekoven's testimony to support its conclusion. Accordingly, looking at only that evidence, claimant contends that Gripekoven concluded that chronic damage to the levels above and below the fusion would have occurred sometime after the surgery, not that it *had occurred* as of the July 29, 2009, work injury. As claimant explains, "[f]or all the record shows, what claimant had at the time of his compensable injury was a resolved spondylosis and a cervical fusion that made him susceptible to future problems above and below the fusion." Under that view of the record, claimant asserts that employer failed to prove that the fusion contributes to disability or a need for treatment under ORS 656.005(24)(a).

To address claimant's argument, we turn to our recent decision in *Corkum*. In that case, as here, the dispositive issue was whether the medical evidence relied on by the board supported its determination that the condition identified by the employer as the preexisting condition had contributed to the claimant's disability or need for treatment, or had merely rendered the claimant more susceptible to injury. 271 Or App at 421. In *Corkum*, the claimant suffered a hernia, and we were called on to determine whether the board had appropriately determined that the claimant's preexisting abdominal wall weakness was a condition that had contributed to claimant's disability or need for treatment. In rendering its decision that the claimant had a preexisting condition, the board acknowledged a statement by an

examining doctor that claimant's abdominal wall weakness had "predispose[ed] him to develop hernias." *Id.* at 419. The board, however, noted that the doctor had also observed that the claimant's hernia developed "due to weakening of the tissue." Based on the doctor's latter statement, the board determined that the abdominal wall weakness had *caused* the compensable injury and was not merely a predisposition or susceptibility. *Id.*

To analyze the issue, we interpreted the meaning of "susceptible" in ORS 656.005(24)(c). We explained that, based on the text, context, and legislative history of ORS 656.005(24)(c), "a condition merely renders a worker more susceptible to injury if the condition increases the likelihood that the affected body part will be injured by some other action or process but does not actively contribute to damaging the body part." *Id.* at 422. After reviewing the record, we concluded that it did not support the board's determination that claimant's abdominal wall weakness "actively contributed to claimant's condition." The doctor had made several statements in reports that, when considered in the context of the entire record, indicated that his conclusion that the hernia developed "due to weakening of the tissue" could be understood by a reasonable person to mean only that the abdominal wall weakness was a passive contributor that merely allowed the hernia to enlarge, while the "stresses and strains of everyday life" had actively caused the hernia to enlarge. *Id.* at 423. Accordingly, we reversed.

Applying that understanding of "susceptible" to the case at hand, we conclude that the evidence relied on by the board—specifically, Gripekoven's testimony—could be understood by a reasonable person to mean only that claimant's fusion had created a susceptibility to injury at the time of claimant's compensable injury.

To explain, we briefly revisit Gripekoven's testimony. As noted, on two occasions, Gripekoven explained that the fusion surgery had placed abnormal forces on the discs above and below the fusion, which made those disc levels "susceptible" to injury. He also testified that, because the mechanics of the spine were disrupted, it would be common

to see degenerative changes in those discs with the passage of time. He disputed Gritzka's conclusion that such changes would not occur for five to 10 years, explaining that such a time frame is "highly arbitrary," that the actual pace of degeneration depended on multiple factors, and that "it could happen much faster in some people than others." He further acknowledged that it might take several years for x-rays or imaging to show "pathological changes" in the soft tissues and the breakdown in the joints and discs, but he cautioned that "the progressive segmental breakdown or destabilization starts much sooner and—as manifested by pain and discomfort with activities long before you can actually see imaging changes."

When asked about the major contributing cause of claimant's injury, Gripekoven testified that, "at this point in time, which is about a year and a half after his surgery— [the major contributing cause] would be the progressive breakdown of the disc facet joint complexes above and below the fusion," not the acute injury.

The board acknowledged in its final order that Gripekoven had used the term "susceptibility" while explaining the consequences of a fusion on adjacent discs. The board, however, concluded that Gripekoven's testimony established that the fusion had actually caused injury, rather than merely created a susceptibility to further injury, because Gripekoven had explained that claimant's fusion surgery *resulted in* a progressive breakdown of the disc facet complexes above and below the fusion that amounted to the major contributing cause of the disability and need for treatment of the combined condition.

We fail to see how Gripekoven's testimony supports the board's conclusion that the inevitable breakdown of discs adjacent to the fusion had occurred as of the July 29, 2009, work injury. At no point does Gripekoven opine that, as of July 29, 2009, the abnormal forces caused by the fusion had actually caused a breakdown in the adjacent disc levels. Rather, he explained that the breakdown of those discs is "inevitable," that it occurs with the passage of time, and that it could occur much faster in some people than in others. None of that testimony establishes that the breakdown had

occurred within four months of claimant's fusion, or even that Gripekoven would have expected claimant's adjacent disc levels to break down particularly quickly because of factors unique to claimant. As claimant points out, Gripekoven's testimony that, as of the date of his deposition, the major contributing cause was the progressive breakdown of the disc facet joint complexes above and below the fusion does not support the board's conclusion that the breakdown had occurred as of the date of claimant's work injury—over a year before the deposition. Accordingly, nothing in his testimony allows anything more than speculation that claimant suffered from a breakdown of the adjacent discs as of July 29, 2009. Therefore, the effects of the fusion on the disc levels adjacent to the fusion was not a preexisting condition within the meaning of ORS 656.005(24).[5] Because the board's resolution of the case depended on its erroneous conclusion that the fusion had created actual injury as of July 29, 2009, we reverse and remand the board's order.

Claimant's second assignment of error takes issue with employer's medical services denial. ORS 656.245(1)(a) provides, in relevant part:

> "For every compensable injury, the insurer or the self-insured employer shall cause to be provided medical services for conditions caused in material part by the injury for such period as the nature of the injury or the process of the recovery requires, subject to the limitations in ORS 656.225, including such medical services as may be required after a determination of permanent disability. In addition, for consequential and combined conditions described in ORS 656.005(7), the insurer or the self-insured employer shall cause to be provided only those medical services directed to medical conditions caused in major part by the injury."

Employer took the position that the disputed medical services were not causally related to the accepted condition. Claimant asserts that Conklin indisputably requested an evaluation by Camp of claimant's cervical spine for the

---

[5] Again, we note that our analysis is limited to Gripekoven's testimony because that is the medical evidence that the board explicitly relied on. We express no opinion on whether other medical evidence in the record would support the board's conclusion.

purpose of evaluating the effects of the July 29, 2009, injury, not for the purpose of evaluating the "combined condition."

The board concluded that, because the accepted condition was a combined condition, "insofar as the referral to Dr. Camp is directed to the accepted condition, it would only be compensable if the accepted combined condition were caused, in major part, by the injury." The board explained that, because it had upheld employer's determination that, as of February 9, 2010, the accepted combined condition was no longer compensable, the referral of claimant to Camp was not compensable under the second sentence of ORS 656.245(1)(a).

Because the board upheld the medical services denial based on its conclusion that the combined condition denial was correct, and we have reversed on that issue, we reverse and remand the medical services denial portion of the board's order.[6]

Reversed and remanded.

---

[6] In addition, after oral argument in this case, we decided *SAIF v. Carlos-Macias*, 262 Or App 629, 637, 325 P3d 827 (2014), in which we explained that the board must evaluate the denial of proposed medical-diagnostic procedures under ORS 656.245(1)(a) by examining the relationship of the procedure to the claimant's compensable injury, not the "accepted conditions." The board's analysis in this case appears to have applied the incorrect legal standard, which provides an additional basis for reversing the board's order. If necessary, on remand, the board can evaluate employer's medical services denial in light of *Carlos-Macias*.